Case number 23-1406 from the Southern District of Iowa, United States v. Tiano Trice Good morning, Your Honors. May it please the Court, my sister's dad is hitting my mom. These are six words in this case that are really key to the entire thing. Six words excitedly uttered by a six-year-old to a passerby outside his home on Black Friday 2022. Six words contradicted by mom's own twice sworn testimony and repeated statements to policemen on the scene, where she has unflappably denied ever having been physically assaulted and instead described the incident that happened as a loud argument with Mr. Trice, during which he did in fact lift and drop the frame of the bed, which we have of course conceded constituted a grade C violation of Mr. Trice's terms of supervised release, qualifying as a simple assault under Iowa law. These six words, my sister's dad is hitting my mom, were also contradicted by A.H.'s own video recorded statements to police just a short time later. In fact, as the officer tries to clarify A.H.'s statement, my sister's dad is hitting my mom, that he uttered to the passerby, A.H. actually denies to the officer that he saw any hitting and instead describes that he saw Mr. Trice crashing down on his mom, a term also used by his older brother who referred to hearing a crash. And then he explained that crashing down on his mom actually meant that Mr. Trice lifted up and dropped the edge of the bed, precisely as mom described. These six words excitedly uttered by a six-year-old child outside of the courtroom, he did not testify, underlie every single factual and legal determination. No, now counsel, I don't know that's necessarily true, because the nine and 12-year-old, you know what the district court says, he says that the daughter, sufficiently concerned enough to leave the home, one child, I'm quoting the district court, you're well familiar with the record, the brother was sufficiently concerned to take his cat in the bedroom and close the door, and the six-year-old ran outside and found an adult to call the police, and the brothers, we know what the brothers said by the cam, I was so shocked and scared I ran to get Cat and we hid in the room. Correct. So now is that enough to support the child endangerment, even if you almost ignore what A.H. said? Absolutely not, Your Honor. Why not? We have two different situations here. Of course, brother and sister were Mr. Trice's children. He had custody and control over them. Respectfully, there is not a single case in Iowa or, frankly, in any other state that I could find that deals with child endangerment laws where a child being in a completely different room, hearing his parents arguing, and hearing a loud crash with no further description qualifies as creating a knowing and substantial risk to that child's physical, mental, or emotional health. Is the Iowa standard a real or articulable risk or a very real possibility? Goodness gracious. Those are correct, Your Honor. Yeah, that's the standard, I think, at Iowa of danger to mental, physical, or emotional health or safety. Now, are you sure there's not enough from what the 9- and 12-year-olds said and did? I am absolutely sure, Your Honor. And, in fact, it's very significant that neither the 9- or the 12-year-old were in court. There were no statements by the 9- or 12-year-old. Wait, wait, wait. The recording got in. The recording got in, and absolutely, brother, the 9-year-old, did say that he heard the loud arguing, he heard a loud crash. This is entirely— Shocked and scared. He was shocked and scared, in fact. Got the cat. Children being shocked and scared and grabbing their cat and running to the room because they hear mom and dad fighting. I think we're all in a lot of trouble, unfortunately. I just don't think that that is the standard for child endangerment. That is not a very real possibility from hearing a loud crash and loud arguing that that child's physical, mental, and emotional health is going to be substantially impacted. Certainly there's no reason that Mr. Trice should have thought that that was the case. More concerning, I think more relevant here, is the fact that A.H., the 6-year-old child who made this excited utterance, also did not testify. We know nothing about what he saw, except for the fact that he told a passerby, my sister's dad is hitting my mom. And then he later told police that really what he saw was Mr. Trice crashing down on his mom, which he explained meant that he picked up the end of her bed and dropped it back down. Again, exactly what mom described. And not the type of physical assault that could lead the district court to safely reach the conclusions that it did. Again, we don't deny lifting and dropping the bed is an assault, but we do deny that there is any evidence whatsoever on this record outside of these six words excitedly uttered by a 6-year-old to a stranger outside the home, indicating that Mr. Trice made any physical contact whatsoever with CeCe in this case. She described he did not. He picked up the end of the bed and dropped it. And the way that A.H. described this to Officer Bierer outside later is precisely consistent with that. In fact, he specifically denies Officer Bierer asks him, do you know what a hit is? And A.H. says, yes. Did you see Mr. Trice hit your mom? And he says, no. And in fact, he even says that what he told the passerby is not my sister's dad is hitting my mom, but I told her the same thing I told you, officer. I told her about Mr. Trice lifting and dropping the bed. From these six words of that 6-year-old child, and even if we factor in what we know that brother saw, we know nothing about sister's observations. This is clearly not enough to qualify as child endangerment. It's also not enough to prove that she left the house, and that counts. No, Your Honor. She left the house after, exactly what the district court found that was because C.C. was arguing with Mr. Trice, was experiencing a cold, had taken some mucinex PM without telling him, that she didn't perceive herself in control, and that therefore Mr. Trice somehow magically assumed responsibility of a child that wasn't him by virtue of being an overnight guest in the home. Now, when the 6-year-old and the 12-year-old ran outside, we know the 6-year-old ran outside because of the fight. We have no reasons to know why the 12-year-old ran outside, but when they ran outside, Mr. Trice, obviously having no control or custody over the 6-year-old, went to C.C. and said, the kids just ran outside. The 12-year-old is his child, though. The 12-year-old is his, yes, and he also didn't take any action to go find his own 12-year-old child, but he certainly didn't take any action with respect to the 6-year-old. So there's just nothing there that arguably could have caused him to create some custody or control over that child simply by virtue of being an overnight guest in the home. I submit to you that Iowa law does not support the notion that even if this child saw Mr. Trice lift and drop the bed, that that qualifies as a real and articulable or substantial risk to that child's mental health. You've talked about loud noises and arguing, but lifting somebody's bed up and crashing it down and the way the kids describe it, even if sort of hearing a noise might not be enough, wouldn't that be enough? It's an assault. You don't think that that would be enough under Iowa law to be sufficient for child endangerment, particularly when they're pretty little kids? I don't believe it's even close, Your Honor, with all due respect. I think that the case law indicates situations where people are taking very extreme actions, right? A man is physically beating on his wife. We have the Tuiz case, I believe it is, where two parents are literally pulling and having a manhandling argument with the child being lifted up in the air. We don't have any information, even if you could reach the conclusion that AH actually is reliable enough that we can count on a statement that Mr. Trice is hitting his mom, which he later denies, even if we can take all of that, just lifting and dropping the bed, I mean that's not really, Your Honor, in my opinion, that different from, say, kicking the wall or slamming your hand into a table. So what's the line you would draw, at least under Iowa law? Does it have to be actual physical contact between the parents or the adults in the room? You've said kicking the wall, kicking a bed, dropping a bed. What's the line that you think that is drawn in Iowa law for that? I believe Iowa law, at a minimum, is going to require some sort of actual physical contact, some sort of proof that the child— Counsel, this has gotten a minute of reticulation, I'm sure. It has mental, physical, and emotional, so it has to be mental and emotional, not just physical. Correct, Your Honor. Perceive. Yes. So I think that at a minimum, Iowa law requires that the child actually observe something violent, not just parents being angry and slamming around or stomping around. In this case, CeCe actually did describe that Mr. Trice was at the very foot of the bed, she was at the head of the bed, and that nothing about that caused her any damage. I would reserve a little bit of remaining time. Yes, and you'll have one minute. We'll round it up to one minute. I appreciate that. So you know the score. Okay. Ms. Roan. May it please the Court, Laura Roan for the United States Government. Let's look at A.H.'s reliability. And what we know is that he fled his home at night. It was dark and it was cold. The day after Thanksgiving, when he said, my sister's dad is hitting my mom, he cried that out to a stranger. And he did so without motive and without guile. The Court's assessment of his reliability was correct. There is no error in this case. There's no clear error in this case, and the district court got it right. But was A.H. really in, and so you're talking about for whether it's sufficient for child endangerment, is that where? About whether an assault occurred, and whether it, in the definition under Iowa law at Chapter 726, whether there was a real and substantial risk under Ansvach and the other cases, which is what is required. What you see here, Judge Kelly, is really a minimization, a very typical and long-held minimization of violence between parents. And here there were two individuals, two children in the home, young children that were the biological father of A.H.'s mother. And, excuse me, biological father being Mr. Trice. Those were the biological parents of those two older children who were still very, very young. And in that instance, regardless of the compartmentalization and the minimization of the event, what we know is that A.H.'s statements when he fled out into the night for the protection of his mom, and when his sister fled, and his 12-year-old half-brother grabbed the cat and secured and hid in his own room to avoid the escalating violence. What we know is that is reliable. That is what happened. We see it on the 911—we hear it on the 911 call, and we see it in the interactions with their mother. And so does the mother proceed without guile and motive? Absolutely not. And that is clear in the record as it was assessed by the district court here when they found by a preponderance that child endangerment, the grade B violation, had been committed by Mr. Trice. And the mother is even heard coaching A.H., and that is the significant interim event that occurs between his immediate, present-sense impression caught on the 911 call, heard by the helper, Ms. Henry, from his local school, and when he speaks on body cam with the officers in the case. She coached him. She suggested, she instructed and directed her 6-year-old child that you did not see him hitting me. Well, that statement could be taken. You could make a finding about that that might be coaching, but it wouldn't necessarily have to be coaching. If someone's in shock, you say, wait, you didn't see that because it didn't happen. I'm not sure that's the only way that you could perceive C.C.'s short conversation with A.H. Judge Kelly, I think your assessment is exactly correct there. But what we do know is the resulting impact that it obviously had on A.H. But the district court did not find coaching, right? No, Your Honor. Okay, proceed. Thank you. But the district court did find that the statement was made, that the mom made the statement, and that was the interim event before he then minimized and, quite frankly, denied, as was said by my opposing counsel, when he spoke to the officers on the body cam. We see that the actions of General Price, and you see this in the hand splash case, are not required that he foresees that his actions are going to create a substantial risk to the physical, mental, or emotional safety of his biological children. That's not the standard under Iowa law. He just has to knowingly, it's a general intent crime, knowingly commit the acts that result in that. And, again, you see a minimization, even in opposing counsel's brief, that there's no evidence that the child or the children had to seek counseling. We know that the child endangerment statute, the spirit of it, and the intent, and its application by our Iowa courts that children exposed to domestic violence resulting trauma is often lifelong. So what is your view on Iowa law, and where's the line that Iowa would draw between an argument between parents, and maybe some stomping around, and actual conduct that would put a child at emotional, physical, or mental health risk? Well, what we know from the cases, this is case-by-case basis, right? Especially in these factual findings. So help me, so now we've got a federal district court judge doing a case-by-case analysis under the state law. So help me understand your view of the parameters there. Well, first of all, we would look at all the different fact scenarios that have been before the appellate courts in Iowa. But also we have to consider that we start asking ourselves, does it require a strangulation of the victim, the battered parent? Does it require a loaded gun to the head, or a threat made in the visual presence of the children? What we know here is that we have an assault, and we have the assault, and the violence, and the threats made in a way that the biological child, the oldest brother, was scared, as you pointed out to opposing counsel. And so help me understand that under the Iowa law. Well, what that means is it's at the very least, as Mr. Trice concedes, it's a simple assault. Or it's a domestic abuse assault because he committed that upon the biological mother. So would any simple assault that the child, in your position, would nearly any simple assault that a child observed one way or another, whether it was auditory, visual, would be sufficient? Absolutely not. But what we know is that in a simple assault, or here, a domestic abuse assault, in front of those three young children, ages 12 all the way down to six, which caused them to flee and hide, to save the family pet. You even see the pet on the video later. Or to run out into the night and to seek a stranger to get help. Just like we here, we know, in our generation, for Mr. Rogers, look for the helpers. And that is what this six-year-old did. So it's not any assault. It's not any minor verbal threat, only in isolation. But it's here where we know, even the mother conceding, that the six-year-old was scared. And he said that he was scared. And he was so scared that he fled out into the night looking for anybody for help. And he said, call the police. Call the police. My sister's dad is hitting my mom. That's the level of the escalation. And the district court got it right when she found the credible testimony of those kids. She assessed their credibility. She found them reliable. And that's the hallmark of the district court, to make those determinations. And it was no minor matter. We see in opposing counsel's brief where, and this is so common with domestic abuse, when you analyze it, there's a conflation between the minor dispute. The dispute is minor, so the resulting act, well, it was minor, too. That's not the case. You look at the surrounding circumstances and the actions the three children undertook to remain safe, and you see that this was an escalated situation. And we don't even get to the fact that the least reliable individual in this scenario is, as we state in our brief, the mother who definitely has a bloody nose and has shown a result from an assault-causing bodily injury. You know who else saw the blood on her face? The same three kids that were concerned for her safety and the safety of the kitten and themselves. And for those reasons, we know that, given the strength of all this evidence in this case, the district court correctly found defendant did commit a new law violation, a child endangerment under Iowa law, a grade B violation. And the district court got it right. If there aren't any other questions, I'll yield the rest of my time. I'll check. Questions, questions? Seeing none, thank you for your argument. Thank you. Ms. Jansen. Your Honors, the fact that the children were scared tells us absolutely nothing about the severity of the assault. And I think that's really where the district court went wrong here. Surely not absolutely under a totality of the circumstances. I hate to question your mind. Shockingly little. Okay, proceed. Okay. I think it tells us shockingly little. You know, this child, all that the district court had to gauge this child's reliability was those six words. Yes, they were admissible as an excited utterance. And that means that they at least crossed that basic threshold to come into court. But what don't we know? This is my question. With the concession that this was simple assault, doesn't really that actually concede away the appeal with the presence of the children? I don't believe that it does, Your Honor. I mean, the assault, to prove the assault, you have to have an action that causes fear or reasonably places the victim in fear of harm?  Or in fear of an offensive touching. Right. And so you have this violent act of lifting and then slamming down the bed with children, with children present. It seems to me that's just a very small step to, under those circumstances, to actually making out the elements of the domestic assault. Why is that wrong? Your Honor, I think that's wrong because the basic level for simple assault under Iowa law is so low, requiring only an act that puts someone in fear of an offensive touching. I don't think that that even comes close to qualifying as child endangerment unless this court is willing to say that simply putting someone in fear of an offensive touching while children are present is sufficient to convict someone of an aggravated misdemeanor under Iowa law that requires a very real possibility of real and articulable danger to that child's mental, emotional, and physical safety. Did that answer your question? Okay. Thank you for the argument. Case number 22-1406 is submitted for decision by the Court.